**No. 24-11733**

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

_____

WALMART, INC.,

*Plaintiff-Appellee*,

v.

JEAN KING, IN HER OFFICIAL CAPACITY AS CHIEF ADMINISTRATIVE LAW JUDGE OF THE OFFICE OF THE CHIEF ADMINISTRATIVE HEARING OFFICER, ET AL.,

*Defendants-Appellants*.

On Appeal from the United States District Court for the
Southern District of Georgia

## BRIEF FOR APPELLEE

Hashim M. Mooppan
Bijan M. Aboutorabi*
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC  20001
(202) 879-3939
hmmooppan@jonesday.com

*Counsel for Plaintiff-Appellee
Walmart Inc.*

*\*Not a D.C. Bar Member; supervised by
a D.C. Bar Member pending application*

**CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 through 26.1-5, Plaintiff-Appellee Walmart Inc. provides the following list of interested persons and entities and corporate disclosure statement:

1.  Aboutorabi, Bijan M.

2.  Aguilar, Daniel

3.  Aguilar, Raul

4.  Boynton, Brian M.

5.  Cholera, Kuntal

6.  Finley, Joseph E.

7.  Gaiser, T. Elliot

8.  Garland, Merrick, in his official capacity as U.S. Attorney General

9.  Hall, Christopher

10. Hall, the Hon. J. Randal

11. Johnson, Tae, in his official capacity as senior official performing the duties of Director of Immigration and Customs Enforcement

12. Jones Day

13. King, Jean, in her official capacity as Chief Administrative Law Judge of the Office of the Chief Administrative Hearing Officer

14. Leithart, O. Woelke

15.   McHenry, James, in his official capacity as Chief Administrative Hearing Officer

16.   Mooppan, Hashim M.

17.   Salzman, Joshua M.

18.   Steinberg, Jill E.

19.   U.S. Immigration and Customs Enforcement

20.   United States Department of Justice

21.   United States of America

22.   Walmart Inc. (WMT)

Plaintiff-Appellee Walmart Inc. is a publicly-traded company on the New York Stock Exchange under the symbol "WMT."  No parent company or publicly-held corporation owns more than 10% of Walmart Inc.'s stock.

August 23, 2024                              Respectfully submitted,

                                             */s/ Hashim M. Mooppan*
                                             Hashim M. Mooppan

                                             *Counsel for Plaintiff-Appellee*
                                             *Walmart Inc.*

## STATEMENT REGARDING ORAL ARGUMENT

Although the district court's judgment is plainly correct, Walmart agrees that oral argument is warranted given the importance of the constitutional question presented.

## TABLE OF CONTENTS

Page

CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT ..........................................C-1

STATEMENT REGARDING ORAL ARGUMENT ...............................................i

INTRODUCTION ........................................................................1

ISSUES PRESENTED.....................................................................4

STATEMENT OF THE CASE...............................................................4

SUMMARY OF ARGUMENT ...............................................................6

ARGUMENT ...........................................................................10

I.  THE OCAHO ALJ'S REMOVAL PROTECTION IS UNCONSTITUTIONAL...........10

    A.  Article II Of The Constitution Imposes A General Rule That
        The President Must Have Unrestricted Power To Remove
        Executive Officers........................................................10

    B.  The Supreme Court Has Permitted Only Two Narrow
        Exceptions To Article II's General Rule Of Unrestricted
        Removal..................................................................12

    C.  ALJs Fit Neither Exception To The Rule Of At-Will Removal........19

    D.  At Minimum, ALJs' Stringent, Multilevel Removal Protection
        Exceeds Constitutional Bounds...........................................28

II. THE OCAHO ALJ'S ADJUDICATORY POWER IS NOT SEVERABLE FROM
    THE ALJ'S REMOVAL PROTECTION ..............................................35

III. WALMART IS ENTITLED TO INJUNCTIVE RELIEF AGAINST THE OCAHO
    ALJ'S EXERCISE OF ADJUDICATORY POWER WITHOUT NEEDING TO
    SHOW THAT THE UNCONSTITUTIONAL REMOVAL PROTECTION WILL
    HAVE A HARMFUL EFFECT ON THE FUTURE PROCEEDINGS..........................44

CONCLUSION.........................................................................49

CERTIFICATES OF COMPLIANCE AND SERVICE .......................................50

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abrams v. SSA,*
  703 F.3d 538 (Fed. Cir. 2012) .............................................................29

*Alabama v. Ctrs. for Medicare & Medicaid Servs.,*
  674 F.3d 1241 (11th Cir. 2012) .............................................................6

*\*Alaska Airlines, Inc. v. Brock,*
  480 U.S. 678 (1987)...................................................2, 3, 35, 40, 41

*Axon Enter., Inc. v. FTC,*
  598 U.S. 175 (2023)......................................................46, 47

*Ayotte v. Planned Parenthood of N. New England,*
  546 U.S. 320 (2006).............................................................39

*\*Butz v. Economou,*
  438 U.S. 478 (1978)...................................................2, 37, 38, 39

*Calcutt v. FDIC,*
  37 F.4th 293 (6th Cir. 2022) .......................................................47, 48

*City of Arlington v. FCC,*
  569 U.S. 290 (2013)...........................................................27

*Cmty. Fin. Servs. Ass'n of Am. v. CFPB,*
  51 F.4th 616 (5th Cir. 2022) .................................................47, 48, 49

*\*Collins v. Yellen,*
  594 U.S. 220 (2021)..........................................3, 4, 13, 17, 35, 42-46

*CPFB v. Law Offices of Crystal Moroney, P.C.,*
  63 F.4th 174 (2d Cir. 2023) .................................................47, 48, 49

*Decker Coal Co. v. Pehringer*,
    8 F.4th 1123 (9th Cir. 2021) ............................................................21, 24, 31, 47

*Dep't of Labor v. Avery*,
    120 M.S.P.R. 150 (2013) ...................................................................................28

*Edmond v. United States*,
    520 U.S. 651 (1997)....................................................................................20, 24

*\*Free Enter. Fund v. PCAOB*,
    561 U.S. 477 (2010).............1, 4, 10, 11, 14, 23-25, 27, 28, 30-34, 37, 42, 43, 46

*Glidden Co. v. Zdanok*,
    370 U.S. 530 (1962)............................................................................................26

*Humphrey's Executor v. United States*,
    295 U.S. 602 (1935)............................................................................................12

*Jarboe v. HHS*,
    2023 M.S.P.B. 22 (Aug. 1, 2023) ......................................................................33

*\*Jarkesy v. SEC*,
    34 F.4th 446 (5th Cir. 2022) ..................................................................2, 30, 34

*K&R Contractors, LLC v. Keene*,
    86 F.4th 135 (4th Cir. 2023) ..............................................................................47

*Kaufmann v. Kijakazi*,
    32 F.4th 843 (9th Cir. 2022) ..............................................................................47

*Leachco, Inc. v. CPSC*,
    103 F.4th 748 (10th Cir. 2024) .....................................................21, 31, 48, 49

*Loper Bright Enters. v. Raimondo*,
    144 S. Ct. 2244 (2024)...................................................................................20, 33

*\*Lucia v. SEC*,
    585 U.S. 237 (2018).............................................................. 1, 19-21, 23, 25, 27

iv

*Morrison v. Olson*,
    487 U.S. 654 (1988)........................................................................ 13-15, 17, 20

\*Murphy v. NCAA,
    584 U.S. 453 (2018).......................................................................2, 36, 39, 40

*Myers v. United States*,
    272 U.S. 52 (1926).......................................................................11, 16, 18, 25

\*NLRB v. Bell Aerospace Co.,
    416 U.S. 267 (1974).......................................................................20, 22

*Ortiz v. United States*,
    585 U.S. 427 (2018).......................................................................27

\*Ramspeck v. Fed. Trial Examiners Conf.,
    345 U.S. 128 (1953).......................................................................2, 37, 39, 40, 43

*Rodriguez v. SSA*,
    No. 22-13602 (11th Cir. Dec. 6, 2023)...............................................48

*Sec'y of Educ. Review of ALJ Decisions*,
    15 Op. O.L.C. 8 (1991)...................................................................20

\*Seila Law LLC v. CFPB,
    591 U.S. 197 (2020)................... 1, 3, 10-13, 15-21, 25, 26, 28, 30-32, 35, 42, 45

*SSA v. Brennan*,
    27 M.S.P.R. 242 (1985) .................................................................29

*SSA v. Glover*,
    23 M.S.P.R. 57 (1984) ...................................................................29

*SSA v. Levinson*,
    2023 M.S.P.B. 20 (July 12, 2023) ....................................................29, 33

*State Oil Co. v. Khan*,
    522 U.S. 3 (1997)..........................................................................21, 46

*Trump v. United States*,
  144 S. Ct. 2312 (2024).......................................................................16

\**United States v. Arthrex, Inc.*,
  594 U.S. 1 (2021)............................................. 12, 18, 19, 22, 24, 25, 27, 34, 41

*United States v. Jackson*,
  55 F.4th 846 (11th Cir. 2022) ............................................................25

*United States v. Perkins*,
  116 U.S. 483 (1886)......................................................13, 15, 17, 20

*United States v. Reese*,
  92 U.S. 214 (1875)...........................................................................39

*Wiener v. United States*,
  357 U.S. 349 (1958).............................................................12, 14, 26, 41

*Wilkins v. United States*,
  598 U.S. 152 (2023)...........................................................................25

## CONSTITUTIONAL AND STATUTORY AUTHORITIES

U.S. Const. Article II, § 1, cl. 1 ..............................................................11

5 U.S.C. § 556.............................................................................27, 41

5 U.S.C. § 557..................................................................................19

5 U.S.C. § 632 (1946) .......................................................................38

5 U.S.C. § 1202 ...................................................................1, 10, 30, 38

5 U.S.C. § 7521 .............................................................1, 10, 28, 33, 38

5 U.S.C. § 7703 ................................................................................34

7 U.S.C. § 6992 ................................................................................27

8 U.S.C. § 1324a .............................................................2, 4, 5, 24, 27, 41

15 U.S.C. § 78d...................................................................................35

41 U.S.C. § 7105.................................................................................27

Pub. L. No. 70-404, 60 Stat. 237 (1946)..................................................38

Pub. L. No. 95-454, 92 Stat. 1111 (1978)................................................38

## OTHER AUTHORITIES

1 Annals of Cong. 463 (1789)................................................................11

8 C.F.R. § 27a.9 ...................................................................................5

28 C.F.R. § 68.54 ...............................................................................19

28 C.F.R. § 68.55 ...............................................................................19

Hearings on H.R. 11280 Before the H. Comm. on Post Off. & Civ.
Serv., 95th Cong. 824 (1978)...........................................................38

Harold J. Krent, *Presidential Control of Adjudication Within The Executive Branch*, 65 Case W. Reserve L. Rev. 1083 (2015)...........................27

S. Rep. No. 79-752 (1945) ...................................................................39

# INTRODUCTION

The Government seeks to subject Walmart to administrative proceedings before an Administrative Law Judge (ALJ) who is shielded from presidential removal by two robust layers of protection. The ALJ, who serves within DOJ's Office of the Chief Administrative Hearing Officer (OCAHO), may not be removed by the Attorney General except "for good cause established and determined by the Merit Systems Protection Board," 5 U.S.C. § 7521(a); MSPB members, in turn, may not be removed by the President except "for inefficiency, neglect of duty, or malfeasance in office," *id.* § 1202. This scheme plainly violates Article II of the Constitution, and the district court correctly enjoined the Government from continuing the unlawful proceedings before the insulated ALJ.

The "general rule" is that the President must have "unrestricted removal power" over inferior officers in executive agencies to ensure their accountability to the public, with one narrow exception allowing modest tenure protection for those with "limited duties and no policymaking or administrative authority." *Seila Law LLC v. CFPB*, 591 U.S. 197, 215, 218 (2020). ALJs fall well outside that exception. They hold continuing positions with wide-ranging duties, not temporary or minor roles. *See generally Lucia v. SEC*, 585 U.S. 237 (2018). And even if some removal protection were permissible, their robust, "multilevel protection" is not, *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 484 (2010), as the Fifth Circuit has held for SEC

1

ALJs, *Jarkesy v. SEC*, 34 F.4th 446, 463-65 (5th Cir. 2022), *aff'd on other grounds*, 144 S. Ct. 2117 (2024).

Moreover, ALJs' removal protection cannot be severed from their adjudicatory power, because such a scheme would not "function in a *manner* consistent with the intent of Congress." *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 685 (1987). Making ALJs removable at the will of their agency heads would be "exactly backwards" as a remedy, *Murphy v. NCAA*, 584 U.S. 453, 483 (2018), as it would recreate the problem that Congress designed this statutory scheme to fix. Under the old regime, the fact that hearing examiners were "subservient" "tools" of their agency heads, *Ramspeck v. Fed. Trial Examiners Conf.*, 345 U.S. 128, 130-32 (1953), caused them to be perceived as lacking the "independent judgment" required for "fair and competent" adjudications, *Butz v. Economou*, 438 U.S. 478, 513-14 (1978). And it would be particularly perverse to make *OCAHO* ALJs removable at will by the Attorney General, because Congress expressly required him to use these independent officers for the class of adjudications at issue here, prohibiting him from personally conducting such adjudications. 8 U.S.C. § 1324a(e)(3)(B). Accordingly, the proper judicial remedy is to enjoin the unlawful ALJ proceedings pending against Walmart, while leaving to Congress how to restructure the system in a manner that satisfies both constitutional requirements *and* legislative intent.

The Government's contrary arguments defy Supreme Court precedent. On every key issue, the Government either ignores binding legal standards or distorts them beyond recognition.

*First*, on the merits, the Government seeks to turn a narrow exception to the President's unrestricted removal power into a broad license for Congress to insulate executive officers from the President's supervision. Remarkably, the Government never even acknowledges that, under *Seila Law*, at-will removal is the "general rule" and that the sole exception for inferior officers is confined to those with "limited duties and no policymaking or administrative authority." 591 U.S. at 215, 218.

*Second*, on severability, the Government likewise does not address whether adjudications conducted by removable ALJs would "function in a *manner* consistent with the intent of Congress." *Alaska Airlines*, 480 U.S. at 685. Although the Government emphasizes cases holding that Congress would prefer a non-independent officer to no officer at all, it ignores that those were cases where Congress was creating new offices rather than reforming flawed ones.

*Third*, on judicial relief, the Government asserts that *Collins v. Yellen*, 594 U.S. 220, 259 (2021), prohibits granting *any* remedy unless Walmart can show that the removal restriction will cause it "compensable harm" in ALJ-run adjudications. But *Collins* addressed the standard for obtaining relief against past actions taken by officers who acted under severable removal restrictions. It does not apply to

injunctive relief against future actions, let alone ongoing proceedings conducted by an officer acting under a non-severable removal restriction. *See id.* at 258-59 & n.23; *Free Enter. Fund*, 561 U.S. at 491 n.2, 513.

In short, the Government's arguments are foreclosed by Supreme Court precedent down the line. And though the Government emphasizes a handful of out-of-circuit cases—while minimizing the Fifth Circuit's *Jarkesy* decision—most of those cases are inapposite and the rest are ill-reasoned. This Court should therefore affirm the judgment enjoining the unlawful ALJ proceedings against Walmart.

## ISSUES PRESENTED

1.    Is the OCAHO ALJ's removal protection unconstitutional?

2.    Is the OCAHO ALJ's removal protection non-severable from the ALJ's adjudicatory power?

3.    May Walmart obtain injunctive relief against the OCAHO ALJ's future exercise of adjudicatory power without needing to show that the ALJ's unconstitutional removal protection will have a harmful effect on the proceedings?

## STATEMENT OF THE CASE

Federal law requires employers like Walmart to verify a new employee's identity and employment eligibility by completing a Form I-9, and then to retain the I-9s for a statutory period. *See* 8 U.S.C. § 1324a(a), (b). In November 2022, U.S. Immigration and Customs Enforcement (ICE), which investigates compliance with

these requirements (*see* 8 C.F.R. § 27a.9(b)), informed Walmart that its inspection of 20 Walmart facilities had resulted in 11,103 charged paperwork violations, for which ICE intended to seek penalties of over $24 million. Dist. Ct. Dkt. (Dkt.) 7-1 at 2-3, ¶¶ 2-4. The charges generally pertain to alleged errors in the electronic systems the 20 facilities used to complete and store employees' I-9s. *Id.* at 3, ¶ 3. ICE did not charge that Walmart had employed anyone unlawfully. *Id.*

As required to contest the charges, Walmart timely requested a hearing, which "shall be conducted" by an OCAHO ALJ. *See id.*, ¶ 5; 8 U.S.C. § 1324a(e)(3)(B). ICE filed 20 complaints against Walmart, one for each facility. Dkt. 7-1 at 3, ¶ 6. OCAHO assigned all 20 cases to OCAHO Chief ALJ Jean King. *Id.*, ¶ 7.

On June 16, 2023, Walmart filed a Complaint in the district court, alleging that the OCAHO ALJ scheme violates Article II of the Constitution. *See* Dkt. 1 at 2-3, 6, ¶¶ 1-8, 23-27. Walmart also promptly moved for a preliminary injunction to protect itself from being further subjected to the irreparable harm of proceeding before OCAHO's unconstitutionally insulated ALJs. Dkt. 7. The parties later agreed, after argument, that the court could construe their filings on the preliminary-injunction motion as cross-motions for summary judgment. Dkt. 28 at 1.

On March 25, 2024, the district court granted Walmart's construed motion for summary judgment, Dkt. 33 at 12, and entered final judgment permanently enjoining the pending ALJ-run proceedings against Walmart, Dkt. 34 at 1. It concluded that

ALJs' multilevel protection from removal violates Article II and that the proceedings should be enjoined because the removal protection was non-severable from the ALJ statutory scheme.  Dkt. 33 at 9, 11.

The Government timely appealed.  Dkt. 35.  As no facts are disputed and "conclusions of law" are dispositive, this Court's review is "*de novo*."  *Alabama v. Ctrs. for Medicare & Medicaid Servs.*, 674 F.3d 1241, 1244 n.2 (11th Cir. 2012).

## SUMMARY OF ARGUMENT

**I.**     Under Article II and Supreme Court precedent, the general rule is that the President must have unrestricted power to remove executive officers.  Congress, however, has constructed a statutory scheme designed to insulate ALJs from presidential supervision through two robust layers of removal protection.  The first level alone is unconstitutional, and the second level compounds the violation.

For inferior officers like ALJs, the Supreme Court has recognized only a single narrow exception allowing some removal protection for officers wielding "limited duties and no policymaking or administrative authority."  ALJs meet none of those criteria given the scope and significance of their powers in conducting agency adjudications.  They are thus subject to the general rule of at-will removal.  And at minimum, they cannot have the extreme tenure protection that Congress has conferred.  As established by the MSPB pursuant to statutory delegation, "good cause" to remove ALJs is tightly cabined to safeguard their decisional independence.

That goes well beyond anything the Supreme Court has ever allowed for an inferior officer acting within and for an executive agency. Furthermore, the MSPB is itself an independent agency with stringent removal protection. That creates the type of multi-layer insulation from the President that the Supreme Court has already rejected, as the Fifth Circuit has correctly held.

The Government defends all this in two ways. *First*, the Government tries to resurrect a moribund approach to the removal power. Implicitly conceding that ALJs do not fit within the only exceptions the Supreme Court has allowed, it urges a sweeping new one that would swallow the rule. It contends that Congress may impose restrictions on the removal of any inferior officers who are not "so central to the functioning of the Executive Branch" that at-will removal is required. But the Supreme Court's most recent cases have decisively rejected this balancing approach, holding that the existing exceptions are the furthest incursions on the removal power that it will tolerate. *Second*, the Government tries to portray ALJs as unique. It stresses that Congress viewed their independence as vital to public perception of the fairness and competence of agency adjudications, and it insists that agency heads nevertheless retain sufficient supervisory power through their ability to review and reverse ALJs' decisions. Again, though, the Supreme Court has instructed otherwise. It has held that agency adjudications are fundamentally exercises of executive power that must be subject to presidential control. And it has further held

7

that the power of an agency head to correct an inferior officer's errors on the back end is no substitute for the ability to use the threat of removal to ensure that the job is done right in the first place. Accordingly, the district court correctly held that the OCAHO ALJ's removal protection is unconstitutional.

II.    The OCAHO ALJ's removal protection is non-severable from the ALJ's adjudicatory power. Courts cannot sever an unconstitutional provision where the remainder of the statute would not function in the manner Congress intended. Here, severing ALJs' removal protection would make them subservient to agency heads, recreating the perceived unfairness and partiality that Congress designed this system to fix, as the Government itself emphasizes. In other words, Congress only vested ALJs with adjudicatory power *because* they were cloaked with removal protection. A judicially imposed "remedy" severing the connection would be exactly backwards from Congress's perspective, especially since it considered other, constitutional proposals for how to achieve its goals. All this applies with particular force to *OCAHO* ALJs. Congress expressly prohibited the Attorney General from personally conducting these adjudications against Walmart, but that prohibition would be meaningless if this Court transformed OCAHO's ALJs into the Attorney General's pawns.

The Government emphasizes that the Supreme Court has generally severed unconstitutional removal restrictions. But that is because, in the context of a newly

created independent officer, Congress typically would prefer that the officer be made politically accountable than to have no officer at all. That is not true, however, for ALJs. The statutory and historical context demonstrates that the last thing Congress would want is for the judiciary to restore a flawed system where the public lacked confidence in the fairness and impartiality of agency adjudications. Accordingly, the district court correctly enjoined the OCAHO ALJ from conducting the adjudications against Walmart, while allowing Congress to choose how to restructure the scheme in a manner that respects both constitutional rights and legislative preferences.

**III.** The Government errs in arguing that Walmart cannot obtain any judicial relief unless it shows that the unconstitutional removal protection will have a prejudicial effect on proceedings conducted by the insulated OCAHO ALJ. The Supreme Court has only required plaintiffs raising removal-power claims to demonstrate "compensable harm" in the context of seeking to invalidate past agency action taken by an officer shielded by a severable removal protection. Here, in contrast, Walmart seeks to enjoin ongoing agency proceedings conducted by an officer shielded by a non-severable removal protection. The Supreme Court's precedents make clear that relief is available in these circumstances without any showing of compensable harm. Most of the out-of-circuit cases the Government invokes are inapplicable, and the rest are unpersuasive.

# ARGUMENT

## I.    THE OCAHO ALJ'S REMOVAL PROTECTION IS UNCONSTITUTIONAL

ALJs operate at the front lines of the administrative state. They exercise significant executive authority in shaping agency records and implementing ambiguous statutes. And they have the power to affect vast swaths of everyday life in this country. Article II demands they be accountable to the President, whose executive power they wield. Yet by intent and design, ALJs are very hard to fire. Agency heads may remove them "only for good cause established and determined by the [MSPB]." 5 U.S.C. § 7521(a). In turn, the President may not remove MSPB members except "for inefficiency, neglect of duty, or malfeasance in office," *id.* § 1202(d). This statutory scheme is irreconcilable with Article II and the Supreme Court's precedents.

### A.    Article II Of The Constitution Imposes A General Rule That The President Must Have Unrestricted Power To Remove Executive Officers

The Constitution vests the "entire" power to execute federal law in the President "alone." *Seila Law v. CFPB*, 591 U.S. 197, 213 (2020). Wielding that power means the President must have the "authority to remove those who assist him." *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 513-14 (2010). The President's ability to control his subordinates is necessary for him to be "fully accountable for discharging his own responsibilities," *id.* at 514, through a "clear and effective chain

of command," *id.* at 498.  Thus, the "general rule" is that the President must have "unrestricted removal power" over executive officers.  *Seila Law*, 591 U.S. at 215.

That rule is dictated by the Constitution's text.  Article II "vest[s]" all of "[t]he executive Power … in a President."  U.S. Const. art. II, § 1, cl. 1.  And it imposes on him a corresponding duty to "take Care that the Laws be faithfully executed."  *Id.* art. II, § 3.  This enormous and exclusive mandate requires that he have subordinates to assist him and the ability to supervise them.  *Seila Law*, 591 U.S. at 213.

In turn, the power to supervise "generally includes the ability to remove executive officials," because it is only the person who "can remove" them that they "must fear and, in the performance of their functions, obey."  *Id.* (cleaned up).  Or as Madison put it:  the executive power necessarily encompasses "the power of appointing, overseeing, and controlling those who execute the laws."  1 Annals of Cong. 463 (1789).

The Constitution has been understood this way "[s]ince 1789."  *Seila Law*, 591 U.S. at 215.  In creating the seminal executive departments, the First Congress settled that the President must have the "power to remove—and thus supervise— those who wield executive power on his behalf."  *Id.* at 204.  And nearly a century ago, Chief Justice Taft confirmed in a landmark Supreme Court opinion that the President's "control of those executing the laws" includes the "essential" power of "removal."  *Myers v. United States*, 272 U.S. 52, 117, 163-64 (1926).

**B.      The Supreme Court Has Permitted Only Two Narrow Exceptions To Article II's General Rule Of Unrestricted Removal**

**1.**      The Supreme Court has "recognized only two exceptions to the President's unrestricted removal power." *Seila Law*, 591 U.S. at 204. One applies to certain principal officers, whose direct superior is the President; the other to certain inferior officers, who are "directed and supervised at some level" by principal officers. *United States v. Arthrex, Inc.*, 594 U.S. 1, 13 (2021) (quoting *Edmond v. United States*, 520 U.S. 651, 663 (1997)). The two exceptions are "the outermost constitutional limits of permissible congressional restrictions on the President's removal power." *Seila Law*, 591 U.S. at 218 (quoting *Free Enter. Fund v. PCAOB*, 537 F.3d 667, 698 (D.C. Cir. 2008) (Kavanaugh, J., dissenting)).

*First*, as to principal officers, the Supreme Court has allowed Congress to impose removal restrictions only for heads of "multimember expert agencies that do not wield substantial executive power." *Id.* at 218. In *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), the Court considered the five-member FTC, which it viewed as a nonpartisan "administrative body" that exercised "quasi judicial and quasi legislative" functions, but "no part of the executive power." *Id.* at 624, 628. On that understanding, the Court upheld the provision prohibiting the President from removing FTC Commissioners absent "inefficiency, neglect of duty, or malfeasance in office." *Id.* at 620, 632; *see also Wiener v. United States*, 357 U.S.

349, 350, 354-56 (1958) (invoking *Humphrey's Executor* to infer similar removal restriction for War Claims Commission).

The Court, however, has rejected principal-officer removal protections that go beyond *Humphrey's Executor*. Twice in recent years, it invalidated restrictions that insulated single-headed agencies wielding substantial executive power. *Seila Law*, 591 U.S. at 204-05 (CFPB); *Collins v. Yellen*, 594 U.S. 220, 250-51 (2021) (FHFA). It also pointedly noted that the rationale of *Humphrey's Executor* was repudiated by later precedent. *Seila Law*, 591 U.S. at 216 n.2.

*Second*, as to inferior officers, the Supreme Court has allowed Congress to impose removal restrictions only for those with "limited duties and no policymaking or administrative authority." *Id.* at 218. In the late 19th century, the Court upheld a rule that prevented the Secretary of the Navy from discharging a low-ranking cadet-engineer during peacetime without first finding misconduct or convening a court-martial. *United States v. Perkins*, 116 U.S. 483, 483-85 (1886). A century later, the Court upheld a "good cause" restriction on the Attorney General's ability to remove an independent counsel specially appointed to investigate and prosecute, consistent with DOJ policy, certain crimes by high-ranking officials. *Morrison v. Olson*, 487 U.S. 654, 691-92 (1988).

Not only were those offices limited in scope, but the removal restrictions were relatively modest. *Morrison* observed that the Attorney General could remove the

counsel for any "misconduct." *Id.* at 692; *see id.* at 724 n.4 (Scalia, J., dissenting) (explaining "*cause*" would "include … the failure to accept supervision"). And while *Perkins* did not opine on the standard for misconduct—as the cadet-engineer had done nothing wrong—the military context made clear that insubordination would justify removal (or worse). *Cf. Free Enter. Fund*, 561 U.S. at 507.

Again, however, the Court has rejected inferior-officer removal protections that exceed the "limited restrictions" in *Perkins* and *Morrison*. *Id.* at 495. *Free Enterprise Fund* addressed inferior officers with two levels of protection: Public Company Accounting Oversight Board (PCAOB) members were removable by the SEC only in extreme situations, and SEC Commissioners in turn were assumed to be shielded under *Wiener*. *Id.* at 486-87. The Court held that this "added layer of tenure protection" unconstitutionally withdrew "from the President any decision" on cause to remove PCAOB members, creating "a Board … not accountable to the President, and a President … not responsible for the Board." *Id.* at 495-96.

**2.** Tellingly, the Government all but ignores *Seila Law*, instead trying to transform the *Morrison/Perkins* doctrine—a narrow exception hanging by a thread—into a broad rule with expanding vitality. For inferior officers appointed by department heads, the Government claims that removal protection violates Article II only if their powers are "so central to the functioning of the Executive Branch" that at-will removal is required. Govt. Br. 12 (quoting *Morrison*, 487 U.S. at 691-92).

14

Otherwise, the Government asserts, Congress "may limit and restrict the power of removal" of these officers as an incident of its power to regulate their appointments. *Id.* at 11-12 (quoting *Perkins*, 116 U.S. at 485). None of that is the law.

*First*, the Government's attempt to breathe new life into *Morrison*'s balancing approach to the removal power is foreclosed by recent precedent. Nowhere in *Seila Law* did the Supreme Court even recite, much less apply, *Morrison*'s "so central" standard. Instead, as discussed, *Seila Law* held that the "general rule" is that the President must have "unrestricted removal power" even for "inferior officers," with an "exception[]" only for those who have "limited duties and no policymaking or administrative authority." 591 U.S. at 215, 218. *That* was the test *Seila Law* applied to distinguish the independent counsel in *Morrison*. *Id.* at 219-20. While the Court did "not revisit" its "prior decisions allowing certain limitations on the President's removal power," it "decline[d] to elevate" them into "a freestanding invitation for Congress to impose additional restrictions on the President's removal authority." *Id.* at 204, 228. To borrow an apt phrase, *Morrison*'s balancing approach has been "swept into the dustbin of repudiated constitutional principles." *Morrison*, 487 U.S. at 725 (Scalia, J., dissenting).

Astonishingly, the Government's merits discussion cites *Seila Law* only a single time in a misleading parenthetical. Nowhere does the Government's brief acknowledge that *Seila Law* announced a "general rule" of "unrestricted removal

power" or that it cabined the "exception[]" "for inferior officers" to those with "limited duties and no policymaking or administrative authority."  591 U.S. at 215, 218.  Even worse, the Government mischaracterizes *Seila Law* as "(recognizing that *Perkins* and *Morrison* establish *at least* that 'Congress could provide tenure protections to certain inferior officers with narrowly defined duties' ...)."  Govt. Br. 13 (emphasis added).  Just the opposite.  *Seila Law* imposed a *ceiling*, not a floor, on removal protection.  Again, it described the *Morrison/Perkins* exception as "the outermost constitutional limits of permissible congressional restrictions on the President's removal power" for inferior officers, and it admonished that the choice not to "revisit" those decisions was not "a freestanding invitation for … additional restrictions."  591 U.S. at 218, 228.  The Government's distortion is especially egregious because the Supreme Court recently reiterated that *Seila Law* recognized "*only* 'two exceptions to the President's unrestricted removal power.'"  *Trump v. United States*, 144 S. Ct. 2312, 2328 (2024) (emphasis added).

Moreover, the Government's refusal to accept *Seila Law* simply repackages the failed theories of the Court-appointed *amicus* and the dissent in that case.  The *amicus* similarly argued that *Morrison* and *Humphrey's Executor* established a "general rule that Congress may impose modest restrictions on the President's removal power, with only two limited exceptions"—where Congress reserves for itself a role in removal (as in *Myers*) or where it effectively eliminates the President's

removal power altogether (as in *Free Enterprise Fund*). 591 U.S. at 228. The Court decisively rejected that view as backwards: Under text, structure, history, and precedent, "the President's removal power is the rule, not the exception." *Id.* Likewise, the Court summarily dismissed the dissent's contention that Congress can impose removal restrictions "'so long as the President retains the ability to carry out his constitutional functions,'" because "that amorphous test contains no real limiting principle." *Id.* at 228 n.11 (quoting *id.* at 264 (Kagan, J., dissenting in part)).

*Collins* further confirms the flaw in the Government's reliance on *Morrison*. There, emphasizing that "[c]ourts are not well-suited to weigh the relative importance of the regulatory and enforcement authority of disparate agencies," the Supreme Court squarely held that "the constitutionality of removal restrictions" does *not* "hing[e] on such an inquiry." 594 U.S. at 253. The same "severe practical problems," *id.* at 252, would plague any attempt to resurrect *Morrison*'s "so central to the functioning" standard—a standard defined by amorphous balancing. *See* 487 U.S. at 695-96; *accord id.* at 711-12 (Scalia, J., dissenting).

*Second*, the Government's treatment of *Perkins* is also outdated. Although the Supreme Court in 1886 reasoned that Congress's authority to vest the appointment of inferior officers in a department head "implies authority to limit, restrict, and regulate the removal" of officers so appointed, *Perkins*, 116 U.S. at 485, today's Court has not retained that overbroad rationale. Again, *Seila Law* justified

*Perkins* solely based on the narrow scope of the cadet-engineer's office.  591 U.S. at 218.  That is unsurprising, as the broader rationale in *Perkins* makes no sense. While the Appointments Clause gives Congress the ability to vest appointment of inferior officers in a department head rather than the President, *Arthrex*, 594 U.S. at 12-13, that in no way limits the President's separate prerogative under the Vesting and Take Care Clauses to use removal to supervise how such inferior officers exercise *his* executive power, *Seila Law*, 591 U.S. at 213-14.

Moreover, if any inference were to be drawn from the manner of appointment, it would be the opposite of what *Perkins* suggested.  Insofar as "[t]he power to remove inferior executive officers … is an incident of the power to appoint them," *Myers*, 272 U.S. at 161, the President should have *greater* power to remove the inferior officers appointed *solely* by his "*alter ego*" department heads, compared to the inferior officers as to whom he *shares* appointment with *the Senate*, *id.* at 133. Relatedly, the Government is wrong to suggest (Govt. Br. 11-12) that Chief Justice Taft's opinion in *Myers* followed the flawed rationale in *Perkins*.  Just like the Court in *Seila Law*, the Court in *Myers* accepted the result in *Perkins* but did not adopt its reasoning or extend it to other officers.  272 U.S. at 161-63.  Thus, as in *Seila Law*, *Myers* emphasized that the President's removal power under Article II extends to *all* "executive officers, whether superior or inferior," and that any exceptions are to be "strictly construed, and not to be extended by implication."  *Id.* at 163-64.

18

### C.    ALJs Fit Neither Exception To The Rule Of At-Will Removal

**1.**    ALJs are undisputedly officers, as they possess continuing positions and exercise significant discretion in adversarial proceedings. *See Lucia*, 585 U.S. at 247-51 (addressing SEC ALJs); Govt. Br. 9 (conceding OCAHO ALJs' officer status). So while the district court focused on whether ALJs' removal protection is too robust, *see* Dkt. 33 at 7-9, the threshold inquiry is whether Congress can insulate them *at all*, under either exception to the general unrestricted-removal rule. And the *Humphrey's Executor* exception for certain principal officers is plainly inapplicable; ALJs are inferior officers, as "superior executive officer[s]" (here, the Attorney General and the Chief Administrative Hearing Officer) generally may "review" their actions. *See Arthrex*, 594 U.S. at 14; 5 U.S.C. § 557(b); 28 C.F.R. §§ 68.54-68.55.

The key question is therefore whether the *Morrison/Perkins* exception applies: Do ALJs exercise "limited duties *and* no policymaking *or* administrative authority"? *Seila Law*, 591 U.S. at 218 (emphases added). On every prong, the answer is "no." An ALJ "exercises authority comparable to that of a federal district judge," *Lucia*, 585 U.S. at 242 (cleaned up), far exceeding the narrow roles for which the Court has allowed inferior-officer removal protections.

ALJs' duties are not limited in the same durational or substantive manner as the officers' duties in *Morrison* and *Perkins*—or in any material sense. ALJs serve indefinitely, unlike the counsel's temporary mandate in *Morrison* to fulfill a "single

task." 487 U.S. at 672.  And they wield power over ordinary citizens, whereas the counsel's power was "trained inward to high-ranking Governmental actors." *Seila Law*, 591 U.S. at 219; *cf. Edmond*, 520 U.S. at 661 (recognizing that analogous trial-level "military judges" are not "limited" in "tenure" or "jurisdiction," as *Morrison* used those phrases).  Likewise, the cadet-engineer in *Perkins* was near the bottom of the command chain and so primarily responsible for executing superiors' instructions, *see* 116 U.S. at 483, while ALJs wield "significant discretion" and powerful "tools" "in conducting adversarial hearings," *Lucia*, 585 U.S. at 248.

ALJs also exercise policymaking authority.  DOJ itself has long recognized that ALJs "determine, on a case-by-case basis, the policy of an executive branch agency," "fill[ing] statutory and regulatory interstices comprehensively with [their] own policy judgments." *Sec'y of Educ. Review of ALJ Decisions*, 15 Op. O.L.C. 8, 14-15 (1991).  After all, it is black-letter administrative law that agencies can use a party-specific adjudication, just like general rulemaking, to "formulat[e] … agency policies" and "promulgate a new standard that w[ill] govern future conduct." *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 292-94 (1974).  Indeed, the Supreme Court overruled *Chevron* deference in part because courts fulfill their "judicial role" by resolving "statutory ambiguities" using "traditional tools of statutory construction," whereas agencies are "political actors" that manipulate ambiguities to engage in "policymaking." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2268 (2024).

*Administrative* Law Judges at least possess administrative authority. They are inferior officers exercising "significant authority" under federal law because of the myriad ways they "critically shape the administrative record." *Lucia*, 585 U.S. at 245, 248. ALJs have earned their name; if what they do is not exercising administrative authority, then nothing is.

In sum, ALJs do not fall within the *Morrison*/*Perkins* exception. The "general rule" of "unrestricted removal power" thus applies. *Seila Law*, 591 U.S. at 215.

**2.**     Again, the Government never mentions the *Seila Law* test for inferior-officer removal restrictions, much less tries to show that ALJs have "limited duties and no policymaking or administrative authority" in the way *Seila Law* applied that phrase. *Id.* at 218. Instead, the Government offers a scattershot of observations that effectively amount to a plea for this Court to create a *new exception* for ALJs, which it has persuaded two circuits to adopt. *See Decker Coal Co. v. Pehringer*, 8 F.4th 1123, 1133-36 (9th Cir. 2021); *Leachco, Inc. v. CPSC*, 103 F.4th 748, 764 (10th Cir. 2024). But *Seila Law* made clear that it was not inviting additional exceptions, and only that Court has the "prerogative" to create new exceptions to the rule established by "its precedents." *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997). Regardless, the Government's arguments fail on their own terms.

*First*, the Government principally contends that the "adjudicatory" function is special, and that ALJs need not be as accountable through removal as inferior

21

officers who exercise "policymaking and enforcement functions."  Govt. Br. 16. That distinction is both illusory and misguided.

For starters, no bright line separates adjudication from policymaking *within* executive agencies.  Agencies unquestionably "formulat[e] … policies" through adjudications, *Bell Aerospace*, 416 U.S. at 294, and ALJs play a frontline role in that process, *supra* at 20.  Indeed, the Government admits as much when it argues that agency heads "retain[]" their "power over policy" through their substantive "review" of ALJs' rulings.  Govt. Br. 15.  What the Government cannot explain is how that makes ALJs different from other inferior officers who exercise policymaking authority—all of whom *also* have superiors (by definition), *yet still* fall outside the *Morrison/Perkins* exception to at-will removal.

More fundamentally, ALJs must be accountable to the President even if they do not make policy, given the nature of the power they wield.  "The activities of executive officers may take 'legislative' and 'judicial' forms, but they are exercises of—indeed, under our constitutional structure they *must* be exercises of—the 'executive Power,' for which the President is ultimately responsible."  *Arthrex*, 594 U.S. at 17 (cleaned up).  Thus, "[w]hile the duties of [ALJs] partake of a Judiciary quality as well as Executive, [ALJs] are still exercising executive power and must remain dependent upon the President."  *Id.* (cleaned up).  Although the Government emphasizes that Congress sought to provide ALJs independence to promote fairness

and impartiality, Govt. Br. 13-14, the desire for "'technical competence' and 'apolitical expertise'" does not justify curtailing "the role for oversight by an elected President," *Free Enter. Fund*, 561 U.S. at 498-99.

For better or worse, executive adjudication—conducted by nearly 2,000 ALJs (more than double the number of Article III judges)—"now wields vast power and touches almost every aspect of daily life." *Id.* at 499.  Countless Americans are hauled before such adjudicators and subjected to their many coercive powers. *Lucia*, 585 U.S. at 248-50.  Lest their exercise of executive authority "slip from the [Chief] Executive's control," the use of "removal as a tool of supervision" over them cannot be restricted. *Free Enter. Fund*, 561 U.S. at 499.

*Second*, the Government emphasizes that ALJs' decisions are not final and are subject to back-end review by accountable officials.  Govt. Br. 15-16.  But *Lucia* held that these features "make no difference" to ALJs' status as inferior officers, 585 U.S. at 249-51, and *Free Enterprise Fund* held that "[b]road power over [an inferior officer's] functions is not equivalent to the power to remove" them, 561 U.S. at 504. In the latter case, the SEC could "relieve the [PCAOB] of authority," "amend [PCAOB] sanctions," "issue binding regulations" for the PCAOB, and "enforce [PCAOB] rules on its own," yet all that "power over [PCAOB] *activities*" was deemed no "substitute for authority over its *members*." *Id.* (emphasis added). Article II's "clear and effective chain of command"—with the threat of removal

23

ensuring inferior officers do their jobs correctly—is not satisfied by principal officers' ability to do, or redo, their jobs for them. *Id.* at 498.[1]

The Government misleadingly asserts that, contrary to *Free Enterprise Fund*, the Supreme Court's decisions in *Edmond* and *Arthrex* "recogniz[e] that administrative adjudicators are adequately supervised so long as their decisions are subject to higher levels of review," notwithstanding their statutory removal protection. Govt. Br. 16-17; *see also id.* at 13. Those cases were both Appointments Clause challenges, *not* removal-power challenges. The Court was deciding whether certain agency adjudicators were sufficiently "directed and supervised" by principal officers to qualify as inferior officers who could be appointed by the heads of their departments. *See Edmond*, 520 U.S. at 660-65; *Arthrex*, 594 U.S. at 13-23. Since "[t]he power to remove officers … is a powerful tool for control," *Edmond*, 520 U.S. at 664, the Court discussed the officers' statutory removal standards, *see id.*; *Arthrex*,

---

[1] In *Decker Coal*, the Ninth Circuit also suggested that, because "[n]o statute mandate[d]" the use of ALJs in the adjudications there, the President had simply "tied his own hands" by letting the agency head use ALJs rather than other officers removable at will. 8 F.4th at 1133-34. *Free Enterprise Fund* forecloses that rationale too, instructing that "the separation of powers does not depend" on whether "the encroached-upon branch approves the encroachment"; while the President "can always choose to restrain himself in his dealings with subordinates" in the sense of deferring to their choices, he cannot "escape responsibility for his choices" by delegating power to officers whose removal he cannot control. 561 U.S. at 497. In all events, unlike in *Decker Coal*, the statute in this case *does require* the Attorney General to use an OCAHO ALJ for the adjudications against Walmart. 8 U.S.C. § 1324a(e)(3)(B).

594 U.S. at 16-17, 23, but neither case considered—much less resolved—whether those statutory standards unconstitutionally restricted the President's removal power. Such "questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *United States v. Jackson*, 55 F.4th 846, 853 (11th Cir. 2022) (cleaned up). The Supreme Court does not render "holdings in hiding." *Wilkins v. United States*, 598 U.S. 152, 164 (2023).

*Third*, the Government invokes a footnote from *Free Enterprise Fund* that literally decides nothing. Govt. Br. 20-21. Included in a disavowal of "general pronouncements on matters neither briefed nor argued," 561 U.S. at 506, the footnote stated that the decision did "not address" ALJs either way, *id.* at 507 n.10. It also observed that ALJs' status as "officers" was then unsettled, in part because their powers are "adjudicative" and sometimes "recommendatory." *Id.* But the Court has since held that ALJs *are* officers, *Lucia*, 585 U.S. at 248-51, that executive adjudication exercises executive power all the same, *Seila Law*, 591 U.S. at 216 n.2, and that "unrestricted removal" is the "general rule," *id.* at 215. Those holdings confirm what *Myers* said long ago: "even" when "executive officers" have "quasi-judicial" duties, the President must be able to "consider a decision … as a reason for removing [such an] officer," to "discharge his own constitutional duty of seeing that the laws be faithfully executed." 272 U.S. at 135.

*Finally*, the Government erroneously asserts that there is a historical "practice of affording removal protection to executive branch adjudicators." Govt. Br. 14-15 (citing Court of Claims, Customs Court, and Court of Customs and Patent Appeals). The members of those tribunals, unlike ALJs, were not *inferior executive* officers. Insofar as those tribunals were executive at all (and they mostly were not), they were stand-alone adjudicative bodies whose decisions were reviewed by federal courts rather than superior executive officers. *See Glidden Co. v. Zdanok*, 370 U.S. 530, 552-61 (1962) (plurality op.) (describing the entities' tortured history, and ultimately holding that the Claims Court and Court of Customs and Patent Appeals were themselves Article III courts, not executive tribunals).

Although the Supreme Court has upheld independent adjudicative tribunals that are not Article III courts (like the MSPB), these entities rest on the inapposite fiction underlying the *Humphrey's Executor* exception for certain *principal* officers: *i.e.*, they exercise "no part of the executive power" in light of, among other things, their "organizational features" as freestanding "administrative bod[ies]." *Seila Law*, 591 U.S. at 215-16. That fiction, which "has not withstood the test of time," *id.* at 216 n.2, should *not be extended* to inferior adjudicators working *within and for* an agency. Where an agency head is removable at will by the President—as is the case here for DOJ—applying the fiction to ALJs is untenable: they are indisputably "part of the Executive establishment," *Wiener*, 357 U.S. at 353, so insulating them from

removal "blur[s] the lines of accountability" within an entity for which the public holds the President responsible, *Arthrex*, 594 U.S. at 16.  And where the agency head is *not* removable at will by the President, applying the fiction to the agency's ALJs is intolerable:  "[a] second level of tenure protection changes the nature of the President's review," because the President cannot even hold the agency accountable for its ALJs' actions "to the same extent that he may hold [it] accountable for everything else that it does."  *Free Enter. Fund*, 561 U.S. at 496.

Indeed, history refutes the Government's position.  Adjudications by executive officers have occurred "since the beginning of the Republic." *City of Arlington v. FCC*, 569 U.S. 290, 305 n.4 (2013).  And until the 20th century, it was common for officers exercising such functions to be subject to presidential removal. Harold J. Krent, *Presidential Control of Adjudication Within The Executive Branch*, 65 Case W. Reserve L. Rev. 1083, 1089-91 (2015).  Even now, the APA generally allows agency heads themselves to conduct adjudications, 5 U.S.C. § 556(b); the OCAHO statute here is an atypical exception, 8 U.S.C. § 1324a(e)(3)(B).  In short, there is no well-rooted "historical exception" to the President's removal authority for adjudicators within the Executive Branch.  *Ortiz v. United States*, 585 U.S. 427, 458 (2018) (Thomas, J., concurring.).[2]

---

[2] We are aware of only two removal-protected adjudicative tribunals that are inferior establishments within a larger executive agency—one involving federal contracts, the other farm-program decisions.  *See* 41 U.S.C. § 7105; 7 U.S.C. § 6992.  As in

**D.    At Minimum, ALJs' Stringent, Multilevel Removal Protection Exceeds Constitutional Bounds**

Even if ALJs could receive *some* tenure protection, Congress has gone too far. ALJs have atypically robust removal protections for inferior officers, far surpassing those in *Perkins* and *Morrison*. Worse, the President lacks at-will removal power over the MSPB members whose approval is needed to remove ALJs. This double-insulated system violates *Free Enterprise Fund*.

**1.**    Starting with the first level, the "good cause" standard for ALJ removal "established" by the MSPB is excessively protective. 5 U.S.C. § 7521(a).

The MSPB's "baseline for evaluating good cause in any action against an ALJ is whether the action improperly interferes with the ALJ's ability to function as an independent and impartial decision maker." *Dep't of Labor v. Avery*, 120 M.S.P.R. 150, 153 (2013). Accordingly, the MSPB will not permit an agency to take any adverse action against ALJs "for a reason that interferes with [their] qualified judicial independence." *Id.* at 155.

Thus, as in *Free Enterprise Fund*, the "good cause" standard established by the MSPB is "rigorous" and "unusually high." 561 U.S. at 503. Only rarely can poor adjudicatory performance, such as decisional errors or ignoring supervisory

---

*Seila Law*, these "isolated examples" are insufficient to provide a historical justification for ALJs: they are "modern" (one was created in 1978, and the other in 1994), and they are not "remotely comparable" in power (for they both involve parties who choose to transact with the Government). 591 U.S. at 222.

instructions, be "good cause" for disciplining an ALJ. *See, e.g.*, *Abrams v. SSA*, 703 F.3d 538, 545 (Fed. Cir. 2012) ("failure to follow instructions" qualifies only if the instructions were "unrelated to their decisional independence"). And even when the MSPB agrees that an ALJ may be disciplined, it can insist on lesser sanctions than removal. *See, e.g.*, *SSA v. Brennan*, 27 M.S.P.R. 242, 248, 251 (1985), *aff'd*, 787 F.2d 1559 (Fed. Cir. 1986) ("disruptive conduct" did not warrant removal); *SSA v. Levinson*, 2023 M.S.P.B. 20, ¶¶ 40-41 (July 12, 2023) (reaffirming factors for reviewing sanctions).

Although the Government seeks to downplay the significance of the MSPB's "good cause" standard, its efforts do not bear scrutiny. It concedes that the "good cause" standard safeguards ALJs' "decisional independence." Govt. Br. 14. It further concedes that removal for job performance requires "substantially deficient" flaws. *Id.* at 15. And while the Government suggests that *any* form of "misconduct" could be grounds for an ALJ's removal, *id.*, it tellingly fails to cite any authority— because the MSPB's actual record belies any such claim. *See, e.g.*, *SSA v. Glover*, 23 M.S.P.R. 57, 77-78 (1984) (holding that an ALJ's "misuse of [his] authority" in "an 'act of vengeance and acrimony'"—criticizing a hearing assistant by name in a written opinion "for personal reasons … irrelevant to the merits"—did not "constitute good cause" for any "discipline").

29

This striking degree of insulation far exceeds what the Supreme Court's precedents have accepted for inferior officers. In *Perkins* and *Morrison*, the restrictions were relatively modest and, importantly, permitted removal for insubordination. *Supra* at 13-14. Not so here, given the MSPB's commitment to ALJs' decisional independence. ALJs' stronger protections therefore transgress "the outermost constitutional limits" for inferior officers. *Seila Law*, 591 U.S. at 218.

**2.** The icing on this poisoned cake is the second level of removal protection layered on top. MSPB members themselves are shielded from removal by the President under the highly restrictive "inefficiency, neglect of duty, or malfeasance in office" standard. 5 U.S.C. § 1202(d); *see Seila Law*, 591 U.S. at 229-30 (explaining that this phrase, used in various statutes, does not permit "the President … to remove an officer based on disagreements about agency policy"). *Free Enterprise Fund* forecloses this "multilevel" insulation. 561 U.S. at 498.

As the district court and the Fifth Circuit correctly held, the core reasoning of *Free Enterprise Fund* straightforwardly applies to ALJs. *See* Dkt. 33 at 7-9; *Jarkesy v. SEC*, 34 F.4th 446, 463-65 (5th Cir. 2022), *aff'd on other grounds*, 144 S. Ct. 2117 (2024). ALJs' "dual for-cause [removal] limitations" violate Article II by depriving the President of "the ability to oversee [ALJs] or to attribute [their] failings to those whom he *can* oversee*." Free Enter. Fund*, 561 U.S. at 492, 496. More specifically, the statutory scheme "not only protects [ALJs] from removal except for good cause,

30

but withdraws from the President any decision on whether that good cause exists." *Id.* at 495. "That decision is vested instead in [the MSPB]," and "if the President disagrees with [its] determination, he is powerless to intervene—unless that determination is so unreasonable as to" itself constitute cause for removal. *Id.* at 495-96. "The result is [ALJs who are] not accountable to the President, and a President who is not responsible for [ALJs]." *Id.* at 495.

The Government makes two basic arguments to evade *Free Enterprise Fund*. *See Decker Coal*, 8 F.4th at 1132-33 (adopting parts of these arguments); *Leachco*, 103 F.4th at 763-64 (same). Both arguments fail.

Most fundamentally, the Government tries to limit *Free Enterprise Fund* to its "facts," insisting that the case turned on the PCAOB being *especially* powerful and *especially* tenured. Govt. Br. 21. But *Free Enterprise Fund* was not a single-punch ticket. Although the decision refrained from definitively ruling on officers other than PCAOB members, 561 U.S. at 506-07, it broadly reasoned that an "added layer of tenure protection makes a difference" by "chang[ing] the nature of the President's review," *id.* at 495-96. Indeed, *Seila Law* described that holding categorically: "[W]e declined to extend [removal] limits to … an official insulated by *two* layers of for-cause removal protection." 591 U.S. at 215. *Seila Law* did not even mention the PCAOB-specific details that the Government treats as critical limitations on *Free Enterprise Fund* (in stark contrast to the Court's detailed

description of the contextual factors that *do* limit *Morrison* and *Humphrey's Executor*). *Id.* at 215-18. *Seila Law* also described *Free Enterprise Fund* as a case where Congress had "effectively" "eliminate[d] the President's removal power altogether," *id.* at 228, which applies equally to ALJs; the President is "powerless" to override the MSPB's determination that cause for removal is lacking, "unless that determination is so unreasonable as to constitute 'inefficiency, neglect of duty, or malfeasance in office,'" *Free Enter. Fund*, 561 U.S. at 496.

Applying *Free Enterprise Fund* to ALJs would not, contrary to the Government's assertion, Govt. Br. 21, unsettle a tradition dating back to 1946. As detailed below, ALJs have been cloaked in *two* layers of removal protection only since 1978, for the MSPB's precursor was subject to the President's unrestricted removal power; and Congress replaced that non-independent agency *because* it was viewed as too susceptible to Executive Branch influence between 1946 and 1978. *Infra* at 37-38. ALJ's multilevel tenure protection thus "lack[s] … historical precedent," which is "[p]erhaps the most telling indication of the severe constitutional problem." *Free Enter. Fund*, 561 U.S. at 505.

Recognizing the problem, the Government alternatively tries to argue that the MSPB does not "constitute an impermissible second layer of removal protection." Govt. Br. 18. The Government asserts that "the MSPB does not make a policy judgment as to whether an ALJ should be removed" when it "review[s] the agency's

32

determination that good cause for removal exists," as it is "simply enforc[ing] the 'good cause' protection separately provided by the statute." *Id.* at 18-19.  That assertion rewrites 5 U.S.C. § 7521(a), which unambiguously provides that both the meaning and the existence of "good cause" are "established and determined" by the independent MSPB—not by the ALJ's agency or the statute itself.  The MSPB thus necessarily makes policy judgments about what constitutes "good cause" for removing (or disciplining) ALJs.  *See Loper Bright Enters.*, 144 S. Ct. at 2263 (recognizing that statutes authorizing agencies "to give meaning to a particular statutory term," or empowering them to administer a "flexibl[e]" standard, effectively "delegate[] discretionary authority").

Recent MSPB decisions, *see* Govt. Br. 18-19, are not to the contrary.  They merely reaffirm that the MSPB's "good cause determination" "authorizes" the agency to "take[] [disciplinary] action against an ALJ" but does not "require" it to follow through after receiving the green light.  *Levinson*, 2023 M.S.P.B. 20, ¶¶ 37-39; *accord Jarboe v. HHS*, 2023 M.S.P.B. 22, ¶ 6 (Aug. 1, 2023).  The MSPB still "makes [the] good cause determination," *Levinson*, 2023 M.S.P.B. 20, ¶ 37, including whether the agency's "choice of removal is an appropriate penalty" under the circumstances, *see id.*, ¶¶ 40-51.  So even for ALJs whose direct superiors are politically accountable officers—as in OCAHO—the independent MSPB is the manager's manager with respect to removal.

Nor is the Government correct that this MSPB function "mirrors the role that courts traditionally play in reviewing" whether cause exists under otherwise-permissible removal restrictions. Govt. Br. 19. To start, that misleadingly presents the MSPB as a substitute for Article III review, ignoring that MSPB rulings against ALJs (but not in their favor) are further subject to judicial review in the Federal Circuit. 5 U.S.C. § 7703. And more basically, the Government disregards the critical structural difference between review by the *separate* Judicial Branch (which the Constitution requires to be independent of the President) and review by an independent tribunal *within* the Executive Branch itself (which the Constitution requires to be "dependent upon the President"). *Arthrex*, 594 U.S. at 17. When a federal court blocks an executive agency from removing an inferior officer, that does not "blur the lines of accountability," *id.* at 16, or confuse the public's ability to "determine on whom the blame … ought really to fall" that an unsuited officer remains on the job, *Free Enter. Fund*, 561 U.S. at 498. By contrast, when one part of the Executive Branch blocks another from removing an inferior officer—with the President "powerless to intervene"—that "diffusion of power" within the Executive "carries with it a diffusion of accountability" that Article II forbids. *Id.* at 495-97.[3]

---

[3] The Government's dismissal of the MSPB is also directly contrary to the Fifth Circuit's decision in *Jarkesy*. Although that case purportedly involved a *third* level of removal protection because SEC Commissioners were assumed to be shielded, the court emphasized that the MSPB's insulation created the *second* level of removal protection for SEC ALJs. 34 F.4th at 465. Indeed, the MSPB's removal protection

## II.   THE OCAHO ALJ'S ADJUDICATORY POWER IS NOT SEVERABLE FROM THE ALJ'S REMOVAL PROTECTION

The "appropriate remedy" for the ALJ's unconstitutional removal provision requires a severability analysis:  whether to sever and invalidate just the provision restricting removal, or instead also to invalidate as non-severable the provisions granting executive powers to the insulated officer.  *Seila Law*, 591 U.S. at 232. Here, the only remedy consistent with congressional intent and tailored to the constitutional problem is to declare the ALJ's removal protection non-severable and enjoin the OCAHO adjudications.  As the district court correctly held, "[under] this solution, the unconstitutional actions are stopped for Walmart, and Congress is left with the ability to remedy the problem as it pleases."  Dkt. 33 at 11.

**A.**    The critical "inquiry in evaluating severability is whether the statute will function in a *manner* consistent with the intent of Congress" if the invalid portion alone is voided.  *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 685 (1987). Thus, the "well established" rule is that "the invalid part may be dropped if what is left is fully operative as a law," "*[u]nless* it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not."  *Id.* at 684 (emphasis added).

---

is essential to *Jarkesy*'s holding, as SEC Commissioners are actually removable at will by the President.  They have no express removal protection, 15 U.S.C. § 78d(a), and *Collins* holds that removal protection cannot be inferred except perhaps for purely adjudicatory bodies, 594 U.S. at 250 & n.18, which the SEC is not.

In a recent illustration of the inquiry, the Supreme Court instructed that courts cannot sever an unconstitutional provision, even if the remainder of the statute would be "fully operative," when "rewrit[ing] [the] statute" that way would "give it an effect altogether different from that sought by the measure viewed as a whole." *Murphy v. NCAA*, 584 U.S. 453, 481-82 (2018). In *Murphy*, after invalidating a federal prohibition on States "authoriz[ing]" or "licensing" private sports-gambling facilities, the Court addressed the impact on the law's separate ban on States "operat[ing]" gambling facilities themselves. *Id.* at 481. Invoking *Alaska Airlines*, the Court framed the inquiry this way: "If Congress had known that States would be free to authorize sports gambling in privately owned casinos, would it have nevertheless wanted to prevent States from running sports lotteries?" *Id.*

The Court decided "[t]hat seem[ed] most unlikely"; at the time, "[s]tate-run lotteries" were thought "more benign" and private "[c]asino gambling" "far more dangerous," so "legalizing [the latter] while prohibiting [the former] would have seemed exactly backwards" "[t]o the Congress that adopted" the legislation. *Id.* at 482-83. Because severance would have created "a scheme sharply different from what Congress contemplated," the Court held that the operation ban had to fall with the authorization and licensing bans. *Id.* at 482. The Court likewise held another prohibition inseverable because retaining it would "implement[] a perverse policy" and cause "a weird result" Congress never "contemplated." *Id.* at 484.

36

**B.**    The severability inquiry in this case thus turns on the role of removal protection in the ALJ regime established by Congress.  The "historical context makes it evident," *Free Enter. Fund*, 561 U.S. at 509 (cleaned up), that "[t]he substantial independence that the Administrative Procedure Act's removal protections provide to [ALJs] is a central part of the Act's overall scheme" *Lucia*, 585 U.S. at 260 (Breyer, J., concurring in the judgment in part).

Before the APA was enacted in 1946, ALJs' predecessors (called "hearing examiners") were employees whose "tenure and status" "depended upon their classification," which "was determined by the ratings given them by the[ir] agency." *Ramspeck v. Fed. Trial Examiners Conf.*, 345 U.S. 128, 130 (1953).  This dependence produced "[m]any complaints" that "they were mere tools of the agency," "subservient to the agency heads."  *Id.* at 131.  That was deemed incompatible with the "independent judgment" needed for a "fair and competent" adjudication.  *Butz v. Economou*, 438 U.S. 478, 513-14 (1978).  Executive and legislative committees held "extensive hearings" and considered "[s]everal proposals" for how best to solve the problem.  *Ramspeck*, 345 U.S. at 131-32.

In the APA, Congress chose "to make hearing examiners a special class of semi-independent subordinate hearing officers by vesting control of their compensation, promotion, and tenure in the Civil Service Commission."  *Id.* at 132 (cleaned up).  Until 1978, ALJs were "removable by the agency in which they are

employed only for good cause established and determined by the Civil Service Commission." Pub. L. No. 70-404, § 11, 60 Stat. 237 (1946). Correspondingly, these newly insulated adjudicators were granted additional "powers … comparable to those of a trial judge." *Economou*, 438 U.S. at 513.

Notably, though, the members of the Civil Service Commission were removable at will by the President, 5 U.S.C. § 632 (1946), spawning objections that the Commission was susceptible to "being pressured" by the Executive, Civil Service Reform: Hearings on H.R. 11280 Before the H. Comm. on Post Off. & Civ. Serv., 95th Cong. 824 (1978). So in 1978, Congress *further* insulated ALJs in the Civil Service Reform Act, which replaced the Commission with the MSPB, Pub. L. No. 95-454, §§ 202, 204, 92 Stat. 1111, 1121-22, 1137, and "confer[red] upon [MSPB] members a tenure akin to that of the Federal Judiciary," Hearings on H.R. 11280, *supra*, at 824. Congress made MSPB members removable by the President only under the *Humphrey's Executor* standard, 5 U.S.C. § 1202(d), and ALJs removable by agencies "only for good cause established and determined by the [MSPB]," 5 U.S.C. § 7521(a). Congress meant these two protections to work in tandem; the Reform Act includes no severability clause should either be held invalid.

The upshot of this history is that the relevant provisions of the APA and Reform Act were *remedial* legislation. Rather than creating a new system of executive adjudication, these statutes reformed the old system to cure specific, well-

known "complaints." *Ramspeck*, 345 U.S. at 131. Congress made agency adjudicators "independent and secure in their tenure and compensation," S. Rep. No. 79-752, at 215 (1945), to safeguard actual and apparent impartiality by ensuring that judge-like powers were wielded only by "fair and competent hearing personnel," *Economou*, 438 U.S. at 513-14. That goal "was viewed as 'the heart of formal administrative adjudication,'" and "guarantee[ing] the independence of hearing examiners" was the means by which Congress sought to achieve its goal. *Id.* at 514.

This background makes it unusually evident that severing ALJs' removal protection would improperly "rewrite [the] statute" in a manner that would "give it an effect altogether different from that sought by the measure viewed as a whole." *Murphy*, 584 U.S. at 481-82. A court "cannot use its remedial powers to circumvent the intent of the legislature" in that way. *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 330 (2006) (cleaned up). Doing so "would be to make a new law, not to enforce an old one." *United States v. Reese*, 92 U.S. 214, 221 (1875).

The Government itself admits that securing ALJs' "decisional independence" and "free[dom] from agency coercion" was a "priorit[y]" for Congress. Govt. Br. 14. And it was more emphatic when seeking Supreme Court relief in *Jarkesy*, insisting that the "[i]nvalidat[ion] [of] tenure protection for ALJs" "would thwart Congress's efforts to promote the actual and perceived fairness of agency adjudications." Br. for Petr. at 65, *Jarkesy*, 144 S. Ct. 2117 (No. 22-859) (formatting

altered).  As the Solicitor General explained, such an approach would "recreate the problems that the APA was meant to solve, thereby undermining both the 'fairness' of agency hearings and 'public confidence in that fairness.'"  *Id.* at 66 (quoting *Wong Yang Sung v. McGrath*, 339 U.S. 33, 42 (1950)).

While that policy concern cannot override the constitutional defects with Congress's chosen solution, *supra* at 21-23, it is critical to determining the remedy most consistent with Congress's intent.  Severing ALJs' removal protections would turn them back into the agency foot-soldiers Congress deliberately repudiated, reinstating the very system of adjudications that Congress determined lacked the appearance, if not the reality, of fairness and impartiality.  In fact, it would exacerbate the problem, because these non-independent adjudicators would still wield the additional powers Congress granted them thinking they were now akin to federal judges.  *Supra* at 37-38.  Especially since Congress considered "[s]everal proposals" *besides* tenure protection to reform the pre-APA system, including constitutional ones such as "a completely separate 'examiners' pool," *Ramspeck*, 345 U.S. at 131, 132 n.2, Congress evidently "would not have enacted" a scheme of turbo-charged hearing examiners still subservient to agency heads, *Alaska Airlines*, 480 U.S. at 685.  That option "would have seemed exactly backwards" to the "Congress[es] that adopted" the APA and the Reform Act.  *Murphy*, 584 U.S. at 482-83.

40

Importantly, all this applies with particular force to *OCAHO* ALJs. While Congress emphatically rejected the use of nominally neutral hearing officers who were actually agency tools, it still generally preserved the ability of agency heads to conduct the adjudications themselves, 5 U.S.C. § 556(b), which does not "blur the lines of accountability," *Arthrex*, 594 U.S. at 16. In stark contrast to that default rule, however, the statute at here expressly requires the Attorney General to conduct all hearings using the removal-protected ALJs, thus ensuring decisional independence. 8 U.S.C. § 1324a(e)(3)(B). Making OCAHO's ALJs removable at will by the Attorney General would effectively nullify that statutory provision, which is clear textual evidence that Congress would not have wanted these adjudications conducted by the Attorney General's subservient tools.[4]

**C.** The Government's contrary severability analysis is superficial. The Government never even asks, much less answers, the critical question whether a judicially created scheme in which the OCAHO ALJ exercises adjudicatory power without removal protection would "function in a *manner* consistent with the intent of Congress." *Alaska Airlines*, 480 U.S. at 685. And it dismisses ALJs' removal

---

[4] As for severing *the MSPB's* removal protection, that would be both underinclusive (because it would not solve the problems with ALJs' own removal protection, *supra* at Parts I.C, I.D.1) and overinclusive (because the MSPB's non-ALJ-related adjudicatory duties may be performed by an independent agency under *Wiener*, *supra* at 12-13). Even the Government does not propose that as a remedy.

protection as a trivial congressional "prefer[ence]" that is "not constitutionally required," Govt. Br. 27, disregarding its earlier emphasis that Congress viewed ALJ independence as vital to ensuring the appearance of fair and competent agency adjudication, *supra* at 39-40.

The Government's argument reduces to a single point:  in prior cases where the Supreme Court held removal restrictions unconstitutional, it severed them, reasoning that Congress would have preferred an accountable officer to none at all. Govt. Br. 26-27; *see Free Enter. Fund*, 561 U.S. at 509; *Seila Law*, 591 U.S. at 235; *Collins*, 594 U.S. at 258 n.23.  But the Government disregards the "historical context" (*Free Enter. Fund*, 561 U.S. at 509) that distinguishes this case.  In the prior cases, the PCAOB, CFPB, and FHFA were new agencies created to fill perceived regulatory voids; while Congress evidently preferred those agencies *also* to be independent, there was no textual or contextual basis to conclude that Congress "would not have" established the agencies otherwise, especially since other methods of achieving Congress's goals were only "theo[retical]" possibilities.  *Free Enter. Fund*, 561 U.S. at 509.  In that context, something was better than nothing.

Here, the opposite is true:  Half a loaf is worse than none when the bread is moldy.  Because ALJs' removal protection was designed to fix an adjudicatory scheme perceived as lacking fairness and impartiality, the *last thing* Congress would have wanted is for the judiciary to restore that flawed state of affairs—much less in

the OCAHO context where Congress mandated the use of ALJs insulated from the Attorney General's control. *Supra* at 41. Congress evidently "would have preferred ... no [ALJs] at all," *Seila Law*, 594 U.S. at 236 (emphasis omitted), until it could adopt one of the "alternatives" to removal protection that it previously considered, *Ramspeck*, 345 U.S. at 132 n.2.[5]

In sum, the Government's proposed remedy is to reinstate the very problem Congress was attempting to solve. Severability principles do not permit that. Rather than "blue-pencil" essential removal protection out of Congress's carefully crafted scheme, *Free Enter. Fund*, 561 U.S. at 509, this Court should affirm the injunction barring OCAHO from conducting ALJ-led adjudications against Walmart. That would redress Walmart's constitutional injury, while allowing Congress to adopt one of the constitutionally compliant alternative options that would further its policy objectives rather than undermining them. *See Collins*, 594 U.S. at 258 & n.23 (recognizing that an unconstitutionally insulated officer lacks valid authority to act if the removal protection is non-severable); *Free Enter. Fund*, 561 U.S. at 491 n.2 (injunctive relief is "the proper means for preventing entities from acting unconstitutionally," including for "separation-of-powers claim[s]").

---

[5] The analysis might be different for ALJs who, unlike OCAHO's ALJs, only *grant benefits*, rather than impose coercive sanctions. In that context, both Congress and private parties may prefer even adjudications that are perceived as slanted in the Government's favor to no adjudications at all.

### III. WALMART IS ENTITLED TO INJUNCTIVE RELIEF AGAINST THE OCAHO ALJ'S EXERCISE OF ADJUDICATORY POWER WITHOUT NEEDING TO SHOW THAT THE UNCONSTITUTIONAL REMOVAL PROTECTION WILL HAVE A HARMFUL EFFECT ON THE FUTURE PROCEEDINGS

Perhaps because its severability arguments are so weak, the Government tries to preempt the remedial analysis entirely, claiming that Walmart is not entitled to *any* remedy unless it can show that the removal restriction will cause it "compensable harm" in adjudications conducted by the insulated OCAHO ALJ. Govt. Br. 22 (quoting *Collins*, 594 U.S. at 259). This confused argument profoundly misconstrues the Supreme Court's decision in *Collins*, which addressed the standard for obtaining relief against *past* actions taken by officers who acted under *severable* removal restrictions. The injunction here, by contrast, provides relief against *future* actions taken by an officer acting under a *non-severable* removal restriction. Both *Collins* and *Free Enterprise Fund* make crystal clear that such relief does not require any further showing of "compensable harm."

**A.** In *Collins*, private parties sought to leverage the FHFA Director's removal protection to collaterally attack the adoption and implementation of a hundred-billion-dollar contract years after it had gone into effect. *See* 594 U.S. at 231-36, 257. They argued the contract had to be "completely undone" because the successive agency heads who had adopted and implemented it all "lacked constitutional authority"—*i.e.*, "their actions were … void *ab initio*." *Id.* at 257.

Although the Supreme Court agreed that the Director's statutory removal protection was unconstitutional, *id.* at 250-51, it concluded that the challengers were not necessarily entitled to relief unwinding the contract, *id.* at 257. The Court explained that "there [was] no reason to regard any of the actions taken by the FHFA in relation to the [contract] void." *Id.* The agency heads all "were properly *appointed*," *id.*; and "the unlawfulness of the removal provision d[id] not strip [them] of the power to undertake the other responsibilities of [their] office," because "[s]ettled precedent … confirm[ed]" that it was *severable*, *id.* at 258 n.23 (citing *Seila Law*, 591 U.S. at 232-38). As the agency heads "lawfully possess[ed]" the "authority to carry out the functions of the office," the Court held that "retrospective relief" undoing their past actions was generally unwarranted—but if the challengers could show that the unconstitutional removal provision had a prejudicial "effect" on specific actions, that would constitute "compensable harm." *Id.* at 258-59.

It thus should be obvious that the remedial analysis in *Collins* is inapposite here. For two independent reasons, "compensable harm" is not required in this entirely different posture.

*First*, unlike in *Collins*, the OCAHO ALJ's removal protection *is* non-severable. *Supra* at Part II. And *Collins* itself explains that where, as here, "the unlawfulness of [a] removal provision" does "strip [an officer of the power to [act]," 594 U.S. at 258 n.23, the officer's actions are void without any further showing of

harm. Such actions, just like the actions of an unconstitutionally appointed officer, constitute the "exercise of power that the actor did not lawfully possess." *Id.* at 258 (citing cases). Indeed, two years after *Collins*, the Supreme Court explicitly recognized that the very ALJ-removal claim Walmart is raising here "would … prevent ALJs … from exercising any power, unless they lose their double-for-cause tenure protection" through judicial "sever[ance]." *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 189 (2023).

*Second*, also unlike in *Collins*, Walmart is seeking only to prevent the OCAHO ALJ from taking any future actions, not to undo the ALJ's past actions. *Collins* expressly noted that the challengers there "no longer ha[d] a live claim for prospective relief." 594 U.S. at 257. By contrast, in *Free Enterprise Fund*, the Court held that the challengers were "entitled to declaratory relief sufficient to ensure" that the law "will be enforced only by a constitutional agency accountable to the Executive," 561 U.S. at 513—without requiring them to show that they would suffer "compensable harm" from the PCAOB's removal protection. *Collins* did not implicitly overrule *Free Enterprise Fund*, and this Court lacks the authority to conclude otherwise in any event. *See State Oil*, 522 U.S. at 20. Moreover, once again, *Axon* underscores the error in the Government's flawed invocation of *Collins*. As in *Axon*, Walmart's "separation-of-powers claim is not about th[e] order" that will issue at the end of OCAHO's adjudication, but rather "about subjection to an

illegitimate proceeding," which raises a "'here-and-now' injury" "irrespective of [the] outcome" of "that process." 598 U.S. at 191-92.

    **B.**    The Government's invocation of *Collins* ignores all of the above. The Government does not address any of the foregoing points about *Collins*, and it does not even mention *Free Enterprise Fund* or *Axon*. Govt. Br. 22-23. Instead, the Government erects a Potemkin village of out-of-circuit cases, which are all inapposite with one exception. *See id.* at 23-24.

    Six of the seven cases applying *Collins*' "compensable harm" requirement involved requests to invalidate past agency actions. Four were challenges to orders issued after completed agency adjudications. *See K&R Contractors, LLC v. Keene*, 86 F.4th 135, 148-50 (4th Cir. 2023) (order denying black-lung benefits); *Calcutt v. FDIC*, 37 F.4th 293, 300-01, 313-20 (6th Cir. 2022) (order removing and penalizing bank executive), *rev'd on other grounds*, 598 U.S. 623 (2023); *Kaufmann v. Kijakazi*, 32 F.4th 843, 849-50 (9th Cir. 2022) (order denying disability benefits); *Decker Coal*, 8 F.4th at 1137-38 (order denying black-lung benefits). The fifth was a challenge to a promulgated regulation limiting payday lenders' ability to obtain loan repayments, *Cmty. Fin. Servs. Ass'n of Am. v. CFPB*, 51 F.4th 616, 624-25, 631-33 (5th Cir. 2022) (*CFSA*), *rev'd on other grounds*, 601 U.S. 416 (2024), and the sixth was a defense to enforcement of a civil investigative demand, *CPFB v. Law Offices of Crystal Moroney, P.C.*, 63 F.4th 174, 179-81 (2d Cir. 2023).

In asserting that some of these cases further held that *Collins* "applies to both retrospective and prospective relief," Govt. Br. 24, the Government is playing word games based on loose language. Three of the cases used the term "prospective relief" to describe requests to prevent the *enforcement* of a completed agency action alleged to be unlawful based on an officer's removal protection *when the action was previously taken. See Calcutt*, 37 F.4th at 316; *CFSA*, 51 F.4th at 631; *Moroney*, 63 F.4th at 180-81. This does not remotely imply that *Collins* extends to suits seeking *injunctive relief against ongoing adjudications* conducted by removal-protected ALJs—an unwarranted extension of *Collins* that, to repeat, would be foreclosed by *Free Enterprise Fund*.[6]

The only case supporting the Government's misapplication of *Collins* is the Tenth Circuit's decision in *Leachco*. There, a corporation sought preliminary injunctive relief against an ongoing ALJ proceeding within the CPSC, challenging the removal protections of both the ALJ and the Commissioners. 103 F.4th at 750-51. Among its reasons for finding a lack of irreparable harm, the court held that the challenger failed to show that "the challenged removal provisions actually impacted,

---

[6] Indeed, in a pending case involving a challenge to an agency order denying disability benefits, counsel for the Government acknowledged that *Collins*' prejudice test is about "retrospective" relief. Oral Arg. in *Rodriguez v. SSA*, No. 22-13602 (11th Cir. Dec. 6, 2023), at 27:12-28:37, https://www.ca11.uscourts.gov/ system/files_force/oral_argument_recordings/22-13602.mp3?download=1.

or [would] impact, the actions taken by the [agency] against it," citing *Calcutt*, *CFSA*, and *Moroney* for the proposition that "*Collins*' relief analysis applies to both retrospective and prospective relief." *Id.* at 757. The court did not recognize that those cases involved barring future enforcement of past agency action, not enjoining ongoing agency proceedings that are unconstitutionally structured. It additionally overlooked that an essential premise of *Collins* was that the FHFA Director's removal protection was severable, failing even to consider whether the same is true for ALJs' removal protection. *See id.* at 756-57. In short, *Leachco* is abysmally reasoned, and this Court should not follow it.

## CONCLUSION

This Court should affirm the district court's judgment.

August 23, 2024

Respectfully submitted,

*/s/ Hashim M. Mooppan*
Hashim M. Mooppan
Bijan M. Aboutorabi*
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC  20001
(202) 879-3939
hmmooppan@jonesday.com

*Counsel for Plaintiffs-Appellants*

*\*Not a D.C. Bar Member; supervised by a D.C. Bar Member pending application*

## CERTIFICATES OF COMPLIANCE AND SERVICE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), I certify that the foregoing brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 11,674 words, as calculated by the firm's word-processing software (Microsoft Word for Microsoft 365).

I certify that on August 23, 2024, I caused the electronic filing of the foregoing with the Clerk of Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system.  I further certify that all counsel of record are users of the appellate CM/ECF system, and will be served by that system.

August 23, 2024                              Respectfully submitted,

                                             */s/ Hashim M. Mooppan*
                                             Hashim M. Mooppan

                                             *Counsel for Plaintiffs-Appellants*

50